# IN THE SUPREME COURT OF IOWA

No. 121/ 07-0671

Filed March 28, 2008

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD**,

Complainant,

vs.

**JAMES ANDREW WEAVER**,

Respondent.

---

On review of the report of the Grievance Commission.

Iowa Supreme Court Grievance Commission recommends suspension of respondent's license to practice law. **LICENSE SUSPENDED.**

Charles L. Harrington and Elizabeth E. Quinlan, Des Moines, for complainant.

James A. Weaver, Muscatine, respondent, pro se.

**TERNUS, Chief Justice**.

The complainant, Iowa Supreme Court Attorney Disciplinary Board, filed a two-count complaint against the respondent, James Weaver. Weaver, an Iowa attorney, was charged with ethical violations based on (1) his commission of second-offense operating while intoxicated (OWI), and (2) his statements to a newspaper reporter challenging the honesty of the judge presiding over Weaver's criminal OWI prosecution. The matter was heard before a panel of the Iowa Supreme Court Grievance Commission, which determined Weaver had violated the Iowa Code of Professional Responsibility for Lawyers and recommended that Weaver's license to practice law be suspended for three months. After reviewing the record and considering the arguments of the parties, we agree that Weaver has committed ethical infractions, and we suspend his license to practice law with no possibility of reinstatement for three months.

## I. Scope of Review.

This matter is before the court for review of the Grievance Commission's report and for final disposition of the charges lodged against the respondent by the Board. *See* Iowa Ct. Rs. 35.9, .10(1). The Board has the burden to prove the alleged ethical violations by a convincing preponderance of the evidence. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman*, 674 N.W.2d 129, 130–31 (Iowa 2004). "A convincing preponderance of the evidence is a greater quantum of evidence than that required in a civil trial, but less than that required to sustain a criminal conviction." *Comm. on Prof'l Ethics & Conduct v. Hurd,* 375 N.W.2d 239, 246 (Iowa 1985).

We review the factual findings of the Grievance Commission de novo. Iowa Ct. R. 35.11(3). Although we give weight to the

Commission's findings, especially when considering the credibility of witnesses, we find the facts anew. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGrath,* 713 N.W.2d 682, 695 (Iowa 2006). "We also respectfully consider the discipline recommended by the Commission, but we are not bound by such recommendations." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hohenadel*, 634 N.W.2d 652, 655 (Iowa 2001).

## II. Factual Findings.

**A. Weaver's Alcoholism and OWI Violations.** Weaver, who was fifty-one at the time of the conduct giving rise to this case, has practiced law in Iowa since his admission to the bar in 1979. From 1982 until December 2004, he served as an associate district court judge. In December 2004, this court granted Weaver's request for a disability retirement from his judicial position. Since that time, he has engaged in the private practice of law in Muscatine.

On November 15, 2002, Weaver was convicted of the crime of operating while intoxicated, first offense. As part of his sentence, he was ordered to complete inpatient treatment for alcoholism. So, in late 2002, Weaver spent twenty-eight days in an inpatient treatment program called New Beginnings. He thereafter remained alcohol free until July 2003.

Meanwhile, the Commission on Judicial Qualifications determined that Weaver's conduct of driving while intoxicated violated the Iowa Code of Judicial Conduct. As part of its investigation of this incident, the Commission on Judicial Qualifications required Weaver to undergo a substance abuse evaluation at Rush Behavioral Health Center. This evaluation, conducted in September 2003 after Weaver's relapse, led to Weaver's inpatient treatment in a Florida program designed for professionals. After his second treatment was completed in November 2003, Weaver remained abstinent until August 2004.

In late 2004, the Commission on Judicial Qualifications recommended to this court that Weaver receive a public reprimand for the conduct that had resulted in Weaver's first OWI conviction. Acting on this recommendation, we entered an order on December 10, 2004, finding Weaver had violated Canons 1 and 2A of the Iowa Code of Judicial Conduct and publicly reprimanding him for these violations.[1] That same month, the court granted Weaver's application for disability retirement based on his alcoholism.

On November 8, 2004, approximately one month before Weaver was publicly reprimanded for his first OWI offense, he was arrested for second-offense OWI after a citizen called police with a reckless-driving report. Weaver was subsequently charged with OWI, second offense, after testing revealed he had a .185 blood alcohol content.

After his second arrest, Weaver was admitted to the Multiple Addictions Recovery Center (MARC) in Davenport on November 10, 2004, where he underwent his third inpatient treatment for alcoholism. Weaver was successfully discharged from that program on December 7, 2004, and reported at the hearing on the current disciplinary charges that he has remained alcohol free since that date. Weaver resumed the practice of law in January 2005.

Judge Denver Dillard was assigned to preside over Weaver's second OWI prosecution, and on April 18, 2005, he accepted Weaver's guilty plea to OWI, second offense. Because Weaver had waived any delay in sentencing, he was sentenced on the same day. Pursuant to a plea

---

[1]Iowa Code of Judicial Conduct Canon 1 provides: "A judge . . . should observe . . . high standards of conduct so that the integrity and independence of the judiciary may be preserved." Canon 2A states: "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

agreement between Weaver and the State, the State recommended a $1500 fine, payment of costs, and 180 days in the county jail with all but seven days suspended. Weaver asked the court that he be given credit against any jail time for the period he spent in inpatient treatment in MARC after his second arrest.

Following a nearly two-hour hearing, Judge Dillard rejected the State's recommendation and, invoking Iowa Code section 904.513,[2] sentenced Weaver to the Iowa Department of Corrections for an indeterminate term not to exceed two years. The court ordered that Weaver, upon mittimus, be immediately placed at an appropriate alcohol treatment correctional facility, and upon achievement of the maximum benefits from the treatment program, be released on parole. He also fined Weaver $1500 plus surcharges. Because Weaver had spent no time in jail following his arrest, the court allowed no credit for time previously served.

Weaver immediately asked the court to keep the record open so he could submit his MARC records to show that he had already completed the same program that would be available through the Department of Corrections. The judge responded that he would entertain a motion to reconsider the sentence and would schedule a hearing for that purpose, but he was not going to change his mind about the sentence at the sentencing hearing. He set the date of May 6, 2005, for Weaver to report to the department for commencement of his sentence.

---

[2]Section 904.513 provides for the assignment of OWI violators to treatment facilities based on a continuum of programming developed by the district departments of correctional services. Iowa Code § 904.513(1)(*a*). The continuum includes a range of treatment options from community residential facilities to prison. *Id.* Offenders are assigned to a particular treatment option based initially on standardized assessment criteria and ultimately on their treatment program performance, compliance with the conditions of an assignment, and other factors. *Id.* § 904.513(1)(*b*)(1), (1)(*b*)(4), (2).

The day after sentencing, April 19, Weaver filed a motion to reconsider sentence, arguing that he would not benefit from the sentence imposed, as he had already undergone the inpatient treatment program that would be available through the Department of Corrections. He also filed several other motions, attaching reports from his MARC treatment to a motion to reopen the record. On May 6, Judge Dillard denied Weaver's motions, stating in pertinent part:

> The Defendant [Weaver] has filed Motion for Reconsideration of Sentence, Motion to Delay Mittimus, Motion to Reopen the Record and Motion for a Presentence Addendum. All of said motions are directed at the request of the Defendant that the court reconsider its sentence before the Defendant begins serving any portion thereof. Based upon the conclusions reached by the court that the defendant has a serious alcohol and substance abuse addiction problem and the past failures of treatment, the court believes that the Defendant's sentence should commence and that any reconsideration of sentence would be based, in part, upon the progress of the Defendant in the treatment program pursuant to Iowa Code section 904.513.

The judge scheduled a hearing for June 3, 2005, for purposes of reconsidering Weaver's sentence.

The same day that Judge Dillard's order denying Weaver's motions was filed, Weaver filed a notice of appeal of his conviction and sentence. Due to his appeal, Weaver did not report to the department to begin his sentence as scheduled on May 6.

On May 31, when Judge Dillard became aware that Weaver had appealed, Judge Dillard signed an order canceling the June 3 hearing "[f]or the reason that the Defendant has filed a Notice of Appeal in this matter." Weaver immediately filed a motion to reconsider the cancellation of the hearing, which the judge denied on June 1, 2005, stating:

> The Defendant's appeal of the judgment and sentence of the court and his posting of the appeal bond has stayed the

execution of the sentence. The Defendant's rejection of the court's judgment makes it impossible for the court to evaluate the rehabilitative effect of the sentence.

On the same day this order was filed, Weaver spoke with a newspaper reporter from the *Muscatine Journal*. An article published the following day was headlined: "Bias on the bench. Ongoing court battle pits judge against retired judge as Weaver makes allegations of personal bias, dishonesty against presiding judge." The reporter included quotes from Weaver in the body of the article, which stated in pertinent part:

> "When Judge Dillard sentenced me in April, he felt that I was in need of substance abuse treatment," Weaver said. "I pointed out to him that I had completed the same treatment program in November 2004."
>
> Although Weaver was supposed to report to the Davenport facility on May 6, Davenport attorney, James D. Hoffman, filed four motions before Dillard on May 3, asking that Weaver's alcohol treatment program records be added into the court's records and contending that Weaver would not gain any benefit from the Davenport substance abuse program because he received similar treatment at a local private hospital program.
>
> Dillard overruled three of Weaver's motions on May 6, but scheduled a hearing for reconsideration of sentence for 1:30 p.m. Friday, June 3, at the Muscatine County Courthouse.
>
> However, on May 31, Dillard canceled the hearing, noting that Weaver had filed an appeal of his sentence. A motion filed the next day by Weaver's attorney, asking Dillard to reconsider the decision to cancel, was rejected.
>
> *"Those [treatment] records were provided to the court during the last two weeks of May," Weaver said. "In response, Dillard canceled the hearing."*
>
> Weaver didn't know why Dillard would show personal bias against him by imposing a two-year prison sentence and canceling Friday's hearing. The usual sentence for second-[offense] operating while intoxicated is a seven-day jail sentence with a 60-day suspended jail term.

> *"I can't speculate about the reasons why he did this,"*
> *he said. "But he's not being honest about the reasons why he*
> *committed me to the Department of Corrections."*

(Emphasis added.)

On October 25, 2006, the Iowa Court of Appeals affirmed Weaver's sentence, concluding Judge Dillard did not abuse his discretion when imposing sentence. This court denied Weaver's request for further review.

**B. Disciplinary Proceedings.** Based upon the above incidents, on December 13, 2006, the Iowa Supreme Court Attorney Disciplinary Board filed a two-count complaint against Weaver, charging him with ethical violations based on his second-offense OWI conviction and the statements he made to the newspaper reporter that are italicized above. In response to the complaint, Weaver admitted his OWI conviction and that he made the statements at issue, but denied he had violated any ethical rules.

After a hearing before a panel of the Grievance Commission at which both parties presented evidence, the Commission issued its report, thoroughly reviewing the evidence, considering both parties' arguments, and explaining its recommended findings of fact, conclusions of law, and sanctions. With respect to count 1, regarding the OWI-second offense, the Commission concluded Weaver violated DR 1–102(A)(6), prohibiting a lawyer from engaging in conduct that adversely reflects on the fitness to practice law. The Commission also determined that Weaver's statements to the reporter were ethical violations, as alleged in count 2 of the Board's complaint. Specifically, the Commission concluded Weaver's statement about why Judge Dillard canceled the reconsideration hearing (1) was a false accusation in violation of DR 8–102(B), which prohibits an attorney from "knowingly mak[ing] false accusations against a judge"; (2)

was prejudicial to the administration of justice in violation of DR 1–102(A)(5), which prohibits an attorney from "engag[ing] in conduct that is prejudicial to the administration of justice"; and (3) was a misrepresentation of fact in violation of DR 1–102(A)(4), which prohibits an attorney from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation." Finally, the Commission concluded Weaver's statement that the judge was being dishonest about the reasons for Weaver's sentence also constituted unethical conduct.

With respect to an appropriate sanction, the Commission, after reviewing mitigating and aggravating circumstances, concluded the ethical violations detailed in each count independently warranted a three-month suspension. Nonetheless, the Commission recommended that Weaver's license be suspended for a total of three months for all violations.

### III. Count I—Commission of Second-Offense OWI.

As noted above, the Commission concluded Weaver's second commission of drunk driving was an ethical infraction in violation of DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice law). Pointing out his OWI offense was only an aggravated misdemeanor, Weaver contends operating while intoxicated is an ethical infraction only when the crime is classified as a felony. He relies on our decision in *Iowa Supreme Court Board of Professional Ethics & Conduct v. Marcucci*, 543 N.W.2d 879 (Iowa 1996).

In *Marcucci*, the respondent had been convicted of third-offense OWI, a class "D" felony. 543 N.W.2d at 880. In concluding the respondent had violated DR 1–102(A)(6), we agreed with the reasoning of the Grievance Commission, quoting with approval from its report: " '[T]he [Commission] is concerned with the public perception of an

attorney with serious alcohol abuse problems and feels that such abuse "adversely reflected" on his fitness to practice law.'" *Id.* at 881. Noting that the offense of which the respondent was convicted was a felony, we stated "[w]e need not decide the gravity of a first-offense conviction for OWI for purposes of applying DR 1–102(A)(6)." *Id.* at 882. Contrary to Weaver's arguments, this court clearly did not hold that an OWI offense is an ethical violation *only* when it constitutes a felony.

Whether an attorney's criminal behavior reflects adversely on his fitness to practice law is not determined by a mechanical process of classifying conduct as a felony or a misdemeanor. The term "fitness" as used in DR 1–102(A)(6) embraces not only one's legal competency, but also "one's character and one's suitability to act as an officer of the court." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford*, 625 N.W.2d 672, 683 (Iowa 2001). This disciplinary rule "focuses on matters that 'lessen[] public confidence in the legal profession.'" *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Johnston*, 732 N.W.2d 448, 454 (Iowa 2007) (quoting *Marcucci*, 543 N.W.2d at 882). Therefore, we examine the attorney's conduct and the surrounding circumstances in determining whether there is an ethical violation.

We found a violation of DR 1–102(A)(6) for misdemeanor conduct in *Iowa Supreme Court Board of Professional Ethics & Conduct v. Thompson*, 595 N.W.2d 132 (Iowa 1999). In that case, the attorney was convicted of two simple misdemeanors, assault and trespass, arising out of the attorney's threatening of his daughter's boyfriend with a loaded shotgun. *Thompson*, 595 N.W.2d at 132, 133. Holding this conduct reflected adversely on the attorney's fitness to practice law, we observed:

> "[W]hen those licensed to operate the law's machinery knowingly violate essential criminal statutes, there

> inexorably follows an intensified loss of lay persons' respect for the law."
>
> As lawyers we take an oath to uphold the law. When, as lawyers, we violate criminal statutes, we violate that oath.

*Id.* at 134 (quoting *Comm. on Prof'l Ethics & Conduct v. Patterson*, 369 N.W.2d 798, 801 (Iowa 1985)).

Turning to the present case, we agree with the Commission that Weaver's commission of second-offense drunk driving reflected adversely on his fitness to practice law. Weaver was arrested shortly after noon on a Saturday after a motorist reported that he had nearly caused a collision. Weaver tested .185, more than twice the legal limit of .08. Notwithstanding the wide margin by which he exceeded the legal limit, he repeatedly denied to the arresting officer that he had been drinking. Moreover, Weaver again and again asked the officer to just let him go, and at one point asked, "Come on, isn't there anything we can do to forget about this?" In summary, Weaver drove a vehicle after a morning of clearly excessive drinking, nearly caused an accident, disputed any responsibility for the near collision, repeatedly denied *any* drinking, and tried to wheedle his way out of an arrest.

We think Weaver's conduct was a negative reflection on his character and his suitability to serve as an officer of the court. His actions would also tend to lessen public confidence in the legal profession. Consequently, we do not hesitate to agree with the Commission that Weaver's actions constituted a violation of DR 1–102(A)(6).

**IV. Count II—Statements Concerning Judge Dillard.**

**A. Controlling constitutional principles.** Because sanctioning an attorney for statements he has made implicates the First Amendment, we begin with a discussion of the constitutional limitations that impact

our consideration of this charge. Initially, we note that "attorneys may be sanctioned for impugning the integrity of a judge or the court only if their statements are false; truth is an absolute defense." *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1438 (9th Cir. 1995) (citing *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 215, 13 L. Ed. 2d 125, 132–33 (1964)). In general, even a false statement is protected by the First Amendment unless made with actual malice, which requires "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 726, 11 L. Ed. 2d 686, 706 (1964) (holding First Amendment protects speech regarding a public official unless made with actual malice). The "reckless disregard" prong of the *New York Times* test "requires more than a departure from reasonably prudent conduct." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696, 105 L. Ed. 2d 562, 589 (1989).

> "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication" [or] . . . that the defendant actually had a "high degree of awareness of . . . probable falsity."

*Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 730–31, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262, 266–67 (1968)).

The Supreme Court has not applied the *New York Times* test to attorney disciplinary proceedings based on an attorney's criticism of a judge. It appears a majority of jurisdictions addressing this issue has concluded the interests protected by the disciplinary system call for a test less stringent than the *New York Times* standard. *See Yagman*, 55 F.3d at 1437 n.12; *In re Cobb*, 838 N.E.2d 1197, 1212-13 (Mass. 2005); *Office of Disciplinary Counsel v. Gardner*, 793 N.E.2d 425, 431 (Ohio

2003). Courts in these jurisdictions have held that in disciplining an attorney for criticizing a judge, "the standard is whether the attorney had an objectively reasonable basis for making the statements." *Cobb*, 838 N.E.2d at 1212.

Interestingly, the Massachusetts Supreme Judicial Court has cited Iowa as one of the jurisdictions that apply an objective standard for malice rather than the subjective *New York Times* test. *Id.* (citing *In re Citation of Frerichs*, 238 N.W.2d 764, 767 (Iowa 1976)). This court did not discuss the *New York Times* test in *Frerichs*, but we did consider the attorney respondent's argument that he did not intend by his statements "to allege the commission of any illegal actions on the part of the court." *Frerichs*, 238 N.W.2d at 767. This court rejected any relevancy of the attorney's subjective intent, stating:

> We do not believe respondent can avoid the impact of his assertions on the basis of his subjective intent. The [Iowa Code of Professional Responsibility for Lawyers] was not promulgated for the private intentions or feelings of judges or lawyers but to protect the integrity of, and public confidence in, our system of justice. Respondent's assertions should be judged with a view to their likely effect on the public's belief in the integrity of the court as an institution. The effect of the respondent's remarks on the public's belief is in no way related to his subjective intent.
>
> Neither does respondent's subjective intent relate to the question of whether his remarks were knowingly made. Respondent, as we have seen, expressly acknowledged his charges were "not made in haste or without appropriate consideration."

*Id.* It appears the present case is the first in which we have expressly considered the appropriate standard to apply in determining whether statements and accusations made by an attorney regarding a judicial officer enjoy constitutional protection. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Visser*, 629 N.W.2d 376, 380–81 (Iowa 2001) (considering impact of First Amendment on attorney's out-of-court

statements regarding matters in litigation); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wherry*, 569 N.W.2d 822, 825 (Iowa 1997) (discussing limitations placed on regulation of attorney advertising by First Amendment). *But see Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515, 517–18 (Iowa 1996) (noting First Amendment test in case involving criticism of judge, but without any discussion of its applicability).

In reviewing cases from other jurisdictions, we find the rationale for using an objective standard in lieu of the *New York Times* test was convincingly expressed by the Minnesota Supreme Court in *In re Disciplinary Action Against Graham*, 453 N.W.2d 313 (Minn. 1990), a case frequently cited for the proposition that an objective test should be used in attorney disciplinary proceedings. The Minnesota court said in that case:

> This court certifies attorneys for practice to protect the public and the administration of justice. That certification implies that the individual admitted to practice law exhibits a sound capacity for judgment. Where an attorney criticizes the bench and bar, the issue is not simply whether the criticized individual has been harmed, but rather whether the criticism impugning the integrity of judge or legal officer adversely affects the administration of justice and adversely reflects on the accuser's capacity for sound judgment. An attorney who makes critical statements regarding judges and legal officers with reckless disregard as to their truth or falsity and who brings frivolous actions against members of the bench and bar exhibits a lack of judgment that conflicts with his or her position as "an officer of the legal system and a public citizen having special responsibility for the quality of justice."
>
> . . . .
>
> Because of the interest in protecting the public, the administration of justice and the profession, a purely subjective standard is inappropriate. The standard applied must reflect that level of competence, of sense of responsibility to the legal system, of understanding of legal rights and of legal procedures to be used only for legitimate purposes and not to harass or intimidate others, that is

> essential to the character of an attorney practicing in Minnesota. Thus, we hold that the standard must be an objective one dependent on what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances.

*Graham*, 453 N.W.2d at 322 (quoting Minn. R. Prof'l Conduct, Preamble).

As another court has noted,

> an objective malice standard strikes a constitutionally permissible balance between an attorney's right to criticize the judiciary and the public's interest in preserving confidence in the judicial system: Lawyers may freely voice criticisms supported by a reasonable factual basis even if they turn out to be mistaken.

*Yagman*, 55 F.3d at 1438. We are persuaded by the rationale given in support of applying an objective standard in cases involving criticism of judicial officers. Therefore, we will employ that standard in considering whether Weaver's statements concerning Judge Dillard are sanctionable.

In deciding whether Weaver's statements are protected by the First Amendment, we must also be aware of the "constitutional limits on the *type* of speech" that may be the subject of discipline. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16, 110 S. Ct. 2695, 2704, 111 L. Ed. 2d 1, 16 (1990) (considering this issue in the context of a defamation action brought against a newspaper and its reporter). Although statements of opinion are not automatically protected by the First Amendment, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at 18, 20, 110 S. Ct. at 2705, 2706, 111 L. Ed. 2d at 17–18. In addition, "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual," such as "rhetorical hyperbole," will also be protected by the First Amendment. *Id.* at 20, 110 S. Ct. at 2706, 111 L. Ed. 2d at 19 (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50, 108 S. Ct. 876, 879, 99 L. Ed. 2d 41, 48

(1988)). But if the statement, even when couched as opinion, implies the assertion "of an objectively verifiable event," "susceptible of being proved true or false," only the limited protection provided by the malice requirement is demanded by the First Amendment. *Id.* at 21-22, 110 S. Ct. at 2707, 111 L. Ed. 2d at 19-20.

As applied to the case before us, these authorities require that we first decide whether Weaver's statements are "sufficiently factual to be susceptible of being proved true or false." *Id.* at 21, 110 S. Ct. at 2707, 111 L. Ed. 2d at 19. If so, the next step is to determine the truth or falsity of these statements. If we find Weaver's statements were false, we must then decide whether Weaver had "an objectively reasonable basis for making the statements." *Cobb*, 838 N.E.2d at 1212. If we conclude Weaver's statements are not entitled to First Amendment protection, we may proceed to a determination of whether his statements violated our Code of Professional Responsibility. We will discuss each statement separately.

**B. Statement Regarding Cancellation of the Hearing to Reconsider Sentence.**

1. *Type of statement.* As noted above, Weaver stated to a newspaper reporter that Judge Dillard canceled the hearing scheduled on Weaver's motion to reconsider sentence in response to receiving Weaver's treatment records. We think this assertion—the judge cancelled the hearing in response to receiving Weaver's medical records—is capable of being proved true or false. Therefore, it is the type of statement that does not enjoy full constitutional protection.

2. *Falsity of statement.* In his order of May 31, Judge Dillard expressly stated he was canceling the hearing "[f]or the reason that the Defendant [Weaver] has filed a Notice of Appeal in this matter," which, in

fact, Weaver had done. Judge Dillard's subsequent order of June 1 amplified this reason:

> The Defendant's appeal of the judgment and sentence of the court and his posting of the appeal bond has stayed the execution of the sentence. The Defendant's rejection of the court's judgment makes it impossible for the court to evaluate the rehabilitative effect of the sentence.

The judge's announced reason for canceling the hearing was entirely consistent with the court's May 6 order scheduling the hearing, in which the judge stated: "[T]he court believes that the Defendant's sentence should commence and that any reconsideration of sentence would be based, in part, upon the progress of the Defendant in the treatment program pursuant to Iowa Code section 904.513."

At the hearing on the Board's complaint, Weaver was specifically asked why he believed "Judge Dillard canceled the hearing in response to the treatment records." He answered, "I don't know. I know that he did. I don't know why." Weaver then acknowledged that the only evidence he had to support his assertion was timing: the treatment records had been provided to the court in the last half of May, and on May 31, Judge Dillard canceled the hearing to reconsider Weaver's sentence. Weaver suggested that the records "disrupt[ed] the reasoning that [Judge Dillard] gave on April 18th for the sentence pronounced." Weaver also admitted, however, that the timing of these events could be a mere coincidence rather than a cause-effect sequence.

Based on our review of the record, we are convinced the Board has met its burden to prove Weaver's statement that the judge canceled the June 3 hearing because the judge had received Weaver's treatment records was false. The reason given in the judge's orders with respect to the cancellation of the hearing was entirely consistent with the judge's

earlier statement that he wanted Weaver to commence his sentence before any reconsideration of that sentence.

In addition, we find unpersuasive Weaver's argument that the judge was motivated to cancel the hearing because the records in some way undermined the reasons the judge had given for the selected sentence. Judge Dillard was aware at the time of sentencing that Weaver had successfully completed treatment through MARC. By the time Judge Dillard scheduled the June 3 hearing, which he did on May 6, 2005, Weaver's successful treatment at MARC had already been documented in the court file.[3] The records the judge subsequently received later in May merely confirmed what the judge already knew and what was already contained in the record. Consequently, if in fact the MARC records undermined the judge's sentencing decision, that "fact" existed at the time the judge set the hearing. The only circumstance that changed between May 6, when the hearing was set, and May 31, when it was cancelled, was the judge's awareness that Weaver had filed a notice of appeal. The sequence of events simply does not support Weaver's contention that the filing of the MARC records prompted the cancellation of the hearing.

3. *Existence of objectively reasonable basis for making the statement.* Weaver admitted that prior to his interview by the newspaper reporter he had seen the court's May 31 order canceling the hearing, as well as the court's June 1 order denying Weaver's motion to reconsider the cancellation of the hearing. If there had been any question in

---

[3]When Weaver filed his motion to reopen the record on May 4, 2005, he attached four letters and reports, including his MARC discharge summary. These letters, reports, and records documented Weaver's participation in and successful completion of the MARC program, as well as his ongoing recovery efforts. These attachments also included a letter from the department of correctional services stating that, if Weaver "had satisfied the need for primary treatment[,] he would be placed in Phase II [of the OWI program]."

Weaver's mind after the May 31 order as to why the notice of appeal would cause the judge to cancel the hearing, that question was answered by the judge's second order. Consequently, it should have been apparent to a reasonable attorney having the information known to Weaver at the time Weaver spoke to the reporter that Judge Dillard did *not* cancel the hearing on Weaver's motion to reconsider because the judge had received Weaver's treatment records. To the contrary, the judge was clear in his May 6 order that he set the hearing far enough in the future to allow implementation of sentence—commencement of the treatment program—and an evaluation of Weaver's progress in the program prior to the court's reconsideration of the sentence. The judge's June 1 order was similarly clear: Because Weaver had appealed, sentence had been stayed, Weaver had not begun the treatment program, there was no way the judge could consider the rehabilitative effect of the program, and hence, there was no purpose in having the hearing.

As we have discussed, Weaver has not suggested a credible basis for his view that the judge cancelled the hearing for a reason other than that stated in the judge's orders. We conclude Weaver did not have an objectively reasonable basis for his statement that Judge Dillard cancelled the hearing as a result of receiving Weaver's treatment records. Consequently, Weaver acted in reckless disregard for the truth or falsity of his statement and thereby forfeited the protection of the First Amendment.

4. *Ethical violation.* Among other violations, the Commission concluded Weaver's statement with respect to cancellation of the hearing was a misrepresentation of fact in violation of DR 1–102(A)(4) (a lawyer shall not "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation"). We have held that a "[n]egligent misrepresentation

does not violate DR 1–102(A)(4)." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Moorman*, 683 N.W.2d 549, 553 (Iowa 2004); *accord Comm. on Prof'l Ethics & Conduct v. Bitter*, 279 N.W.2d 521, 526 (Iowa 1979) (stating the rule is not "violated by acts resulting from 'haste' or 'oversight'"). Proof of "an intent to deceive" is required. *Moorman*, 683 N.W.2d at 553. Intent to deceive can be shown by an attorney's reckless disregard for the truth, as well as by actual knowledge of falsity. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Grotewold*, 642 N.W.2d 288, 293 (Iowa 2002). Thus, to prove a violation of DR 1–102(A)(4), the Board must establish (1) that Weaver's statement was not true, and (2) that he made the statement with actual knowledge of falsity or in reckless disregard for whether the statement was true or not.

We have already determined that Weaver's statement was false. Based on our review of the record, we are also convinced Weaver either knowingly or recklessly misrepresented the judge's reason for canceling the hearing. At the time Weaver commented on the judge's decision to cancel the hearing, Weaver was upset that the judge would not reconsider his sentence unless he had served some portion of it. In an attempt to characterize himself as the victim of unfair treatment by the court, he publicly claimed the judge had cancelled the hearing upon receipt of Weaver's records, implying the judge wanted to avoid a hearing on Weaver's sentence because the records would have shown the sentence was not justified. In addition, Weaver did not make this statement in haste. To the contrary, he testified that he carefully thought about what he wanted to say to the reporter, as "[i]t was very important" for him—Weaver—"to communicate to the public." We believe the Board has proved by a convincing preponderance of the evidence that Weaver intended to deceive the reporter and the public in making this

statement, or at the least acted in reckless disregard for whether his statement was true or not. We hold, therefore, that Weaver violated DR 1–102(A)(4).

**C. Statement Regarding Judge Dillard's Reason for Sentencing Weaver to the Department of Corrections.**

1. *Type of statement.* As noted above, when Weaver was interviewed by the *Muscatine Journal* reporter, Weaver stated Judge Dillard was "not being honest about the reasons why he committed me to the Department of Corrections," a statement repeated in the newspaper article. We think this statement " 'is an articulation of an objectively verifiable event.' " *Milkovich,* 497 U.S. at 21, 110 S. Ct. at 2707, 111 L. Ed. 2d at 20 (quoting *Scott v. News-Herald,* 496 N.E.2d 699, 707 (Ohio 1986)).

In *Milkovich,* the court considered a newspaper article, entitled "Maple beat the law with the 'big lie.' " *Id.* at 4, 110 S. Ct. at 2698, 111 L. Ed. 2d at 8. The article discussed a court decision overturning the disqualification of the Maple Heights High School wrestling team from the state tournament. *Id.* In the article, the reporter stated, among other things, " 'Anyone who attended the meet . . . knows in his heart that [wrestling coach] Milkovich and [superintendent] Scott lied at the hearing after each having given his solemn oath to tell the truth. But they got away with it.' " *Id.* at 5, 110 S. Ct. at 2698, 111 L. Ed. 2d at 9 (quoting *Milkovich v. News-Herald,* 545 N.E.2d 1320, 1321–22 (Ohio 1989)). In the subsequent defamation suit brought by Milkovich, an Ohio trial court granted the defendants a summary judgment "in part on the grounds that the article constituted an 'opinion' protected from the reach of state defamation law by the First Amendment." *Id.* at 3, 110

S. Ct. at 2698, 111 L. Ed. 2d at 8. The Supreme Court reversed with the following analysis:

> The dispositive question in the present case then becomes whether a reasonable factfinder could conclude that the statements in the [newspaper article] imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding. We think this question must be answered in the affirmative. As the Ohio Supreme Court itself observed: "[T]he clear impact in some nine sentences and a caption is that [Milkovich] 'lied at the hearing after . . . having given his solemn oath to tell the truth.'" This is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression.

*Id.* at 21, 110 S. Ct. at 2707, 111 L. Ed. 2d at 19 (quoting *Scott,* 496 N.E.2d at 707).

The facts in *Milkovich* can be helpfully contrasted to the facts in *Yagman.* In the latter case, Yagman, an attorney, wrote a letter critical of one Judge Keller in which he stated, in part:

> It is an understatement to characterize the Judge as "the worst judge in the central district." It would be fairer to say that he is ignorant, dishonest, ill-tempered, and a bully, and probably is one of the worst judges in the United States.

55 F.3d at 1434 n.4. Yagman was subsequently disciplined by a federal district court for alleging that the judge was "dishonest." *Id.* at 1440. On appeal, the circuit court reversed, concluding that when considered in context, Yagman's statement "cannot reasonably be interpreted as accusing Judge Keller of criminal misconduct":

> The term "dishonest" was one in a string of colorful adjectives Yagman used to convey the low esteem in which he held Judge Keller. The other terms he used—"ignorant," "ill-tempered," "buffoon," "sub-standard human," "right-wing fanatic," "a bully," "one of the worst judges in the United States"—all speak to competence and temperament rather than corruption; together they convey nothing more substantive than Yagman's contempt for Judge Keller. Viewed in context of these "lusty and imaginative

expression[s]," the word "dishonest" cannot reasonably be construed as suggesting that Judge Keller had committed *specific* illegal acts. Yagman's remarks are thus statements of rhetorical hyperbole, incapable of being proved true or false.

*Id.* (citations omitted) (emphasis added).

We think the facts of the present case more closely line up with those in *Milkovich* than with those in *Yagman*. Weaver was reported as having said "I can't speculate about the reasons why he did this, . . . [b]ut he's not being honest about the reasons why he committed me to the Department of Corrections." "[T]he clear impact" of this statement is that Judge Dillard gave false reasons for the sentence he imposed. *Milkovich*, 497 U.S. at 21, 110 S. Ct. at 2707, 111 L. Ed. 2d at 19. Paraphrasing the Supreme Court, Weaver's statement "is not the sort of loose, figurative, or hyperbolic language which would negate the impression that [Weaver] was seriously maintaining that [the judge had not been honest]." *Id.* Moreover, it was not an expression of opinion; it was a *specific* statement about *specific* wrongdoing by the judge, capable of being proved true or false.

Nor do we think Weaver's statement is protected simply because he prefaced it with the remark that he couldn't speculate on "the reasons why [the judge] did this." This remark did not transform Weaver's statement that the judge had not been honest into a protected opinion; it simply left the reader at liberty to assume that Weaver knew more than he was saying. *Cf. Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 115 (1st Cir. 2000) ("Whether an opinion is protected hyperbole depends primarily upon whether a reasonable person would not interpret it as providing actual facts about the described individual."); *Yagman*, 55 F.3d at 1439 (discussing distinction between opinion statements "based on assumed or expressly stated facts, and those based on implied, undisclosed facts"

and stating that when "[r]eaders of [the] statement will reasonably understand the author to be implying that he knows facts supporting his view," the statement can be the subject of discipline). We conclude, therefore, that Weaver's statement does not enjoy full constitutional protection and can properly be the subject of discipline.

2. *Falsity of statement.* To determine the truth or falsity of Weaver's statement, it is necessary to more closely examine the circumstances leading up to it. When Judge Dillard scheduled the sentencing hearing, he ordered Weaver to complete an alcohol evaluation. At the sentencing hearing, Weaver offered his 2003 evaluation at Rush as compliance with the court's order. This evaluation was attached to the presentence report prepared by the Department of Correctional Services. Although the presentence report included no other medical records, Weaver stated to the court that he had no additions or corrections to make to the presentence report other than some minor corrections to some financial information.

Pursuant to the parties' plea agreement, the State recommended a sentence of 180 days in jail, with all but seven days suspended; a fine of $1500, plus costs and surcharge; and evaluation and treatment for substance abuse, if deemed appropriate by the court. Weaver's attorney asked the court to approve the plea agreement and requested that the court give Weaver credit against his jail time for his inpatient treatment after his arrest for second-offense OWI. Neither party presented any evidence, although given the opportunity to do so. Weaver was offered his right of allocution, which he exercised to detail the treatment he had received for his alcoholism and depression, as well as the efforts that he had taken to remain abstinent after the completion of his most recent inpatient treatment. He suggested to the court that jail would not be "a

significant consequence" to him and that he had already undertaken sufficient rehabilitative measures.

The court then questioned Weaver extensively concerning the various treatment programs he had completed and also inquired about his relapses. Weaver acknowledged that he had been in denial of his problem for a long time, and that he had not always agreed that he needed treatment. Judge Dillard asked Weaver whether his current abstinence might not be just another chapter in a book of treatment followed by relapse. Weaver assured the judge that this time he had "a very different sense of well-being."

Judge Dillard then discussed his sentencing considerations, stating his two primary concerns were "protection of the community and [Weaver's] rehabilitation." The judge expressly rejected the need for punishment and stated that the notion that Weaver should be held especially accountable because he was a judge at the time of his offense was not a legitimate consideration for sentencing. Judge Dillard noted, however, that Weaver's judicial position did have some relevance in that it provided Weaver with information that should have alerted him to the seriousness of his condition and the options available to him to address that condition. The judge observed that, notwithstanding Weaver's knowledge about the danger of drinking and driving and the fact that he was jeopardizing his career by such conduct, Weaver was unable to overcome his addiction. Judge Dillard expressed doubt that Weaver really had his addiction under control:

> I think that alcohol is a tremendously debilitating addiction and that because of the length of time that you've been drinking as much as you have over the years as reported in the [presentence] report, that it's beyond your will power to deal with this subject, at least I'm not convinced that you can control it.

The judge then announced his decision. He expressly rejected the option of prison or the county jail, noting incarceration is "merely punitive" and "accomplishes nothing other than abstinence." Invoking section 904.513 (the OWI continuum-of-treatment sentencing option), the judge sentenced Weaver to the Department of Corrections for an indeterminate term not to exceed two years and ordered that he be placed at an appropriate alcohol treatment correctional facility. Judge Dillard noted that, upon Weaver's "achievement of the maximum benefits from the program, [Weaver] would be released on parole," which in the judge's view would occur in a significantly shorter period of time than for the "standard person" given the number of treatment programs in which Weaver had already participated. Judge Dillard summarized his thinking, stating: "But I think that another go around of intensive treatment is appropriate, and that's the setting that I think is the best available that we can monitor and control."

Weaver immediately requested that the court leave the record open so he could provide the judge with his records from MARC. Weaver stated his belief that the facility providing treatment for the Department of Corrections is the same facility that conducts the MARC program. He further asserted that he would have produced witnesses had he anticipated the court would have any concerns and that he considered the sentence punitive.

In response, Judge Dillard stated that he was "open to reconsideration," noting "this is a sentence that can be reconsidered." Nonetheless, he refused to do so at that time, stating, "I'm not going to change my mind today on the sentence." Judge Dillard further noted that Weaver would have to file a motion to reconsider. The parties then agreed on a mittimus date of May 6.

As previously noted, Weaver subsequently filed a motion to reconsider, but the hearing on that motion was cancelled after Weaver's sentence was stayed upon his filing of a notice of appeal. Weaver was then interviewed by a journalist who reported that Weaver stated Judge Dillard was "not being honest about the reasons why he committed me to the Department of Corrections."

At the hearing before the Grievance Commission, Weaver was asked by the Board's counsel to explain in what way Judge Dillard was not honest about the reasons for the sentence that was imposed. Weaver's answer was far from concise, rambling for five pages of the transcript. Omitting repetitive and nonresponsive material, we quote Weaver's answer:

> The primary objective that the Court identifies for the term of sentencing is to provide for my rehabilitation and to protect members of the public. I took that to be a consideration that the judge was concerned about my long-term recovery. Unfortunately, the judge, as do many persons, equate[s] treatment with recovery. . . . [T]reatment and recovery are not identical concepts.
>
> Therefore, my view was that his primary objective was recovery. There's also a part of the transcript . . . in which the judge and I specifically discuss the various components of the OWI treatment facility. And those two components . . . [were] the treatment component and the vocational antisocial component.
>
> . . . I asked the judge if he felt it was necessary that I be involved in [the vocational antisocial] component, and he indicated that he did not.
>
> So at that time on April 18th I considered that there were—the two primary objectives were recovery, protection of the public, with the caveat that I did not, in view of the Court, need those rehabilitative services.

We fail to find in this testimony any clue of an alleged falsity in Judge Dillard's announced reasons for sentencing Weaver to the Department of Corrections.

After Weaver's testimony, Judge Dillard testified that he—the judge—sensed at the sentencing hearing that Weaver was attempting to manipulate the sentencing process. Weaver now seizes on this testimony, claiming it reveals a "significant" reason for the sentence that Judge Dillard did not disclose at the sentencing hearing. The judge's perception of Weaver as manipulative cannot be divorced, however, from one of the announced reasons for the sentence—the need for treatment. Judge Dillard testified:

> But the strongest impression that I had that has stuck with me throughout and without reading that transcript again was that Mr. Weaver was trying to control the sentencing. He was trying, in my view, to manipulate the entire process to avoid any incarceration, to avoid being put under control of someone else. *And to me that is a classic alcoholic characteristic.*

(Emphasis added.) The judge also testified that Weaver's controlling personality led the judge to believe that court-ordered treatment, supervised by the Department of Corrections, as opposed to voluntary treatment controlled by Weaver, would be advisable. Thus, Judge Dillard's testimony that he viewed Weaver as manipulative was not an independent reason for the sentence. It merely supported the judge's belief that another round of treatment—under state supervision—would be prudent to determine, as Judge Dillard stated at sentencing, "whether in fact [the treatment] has taken."

After a careful review of the record, we are persuaded by a convincing preponderance of the evidence that Weaver's statement that Judge Dillard was not being honest about why he sentenced Weaver to the Department of Corrections was false. Judge Dillard had serious doubts that Weaver was sufficiently rehabilitated such that he would not once again drink and drive. As the judge stated when explaining his

sentence, "I'm concerned about this being the last time James Weaver is before a court for any reason, but certainly for operating while intoxicated." We conclude Judge Dillard honestly stated his reasons for sentencing Weaver to the Department of Corrections. Weaver's contrary accusation was false.

3. *Existence of objectively reasonable basis for making the statement.* We have failed to discover in the record any objectively reasonable basis for Weaver's assertion that Judge Dillard was not honest in stating his reasons for the sentence. Weaver's own testimony belies a factual basis for his statement. When asked at the disciplinary hearing to explain his decision to speak with a reporter, Weaver testified "[i]t was very important" for him "to communicate to the public" regarding "the general impression left by the judge from his sentence that [Weaver] was not fully participating in a treatment program." He explained:

> The [newspaper] reporting was that the judge concluded that I continued to be in need of substance abuse treatment. I felt that the comments that appeared in the paper suggested that my prior representations in a public setting were not truthful in the sense that I continued to need further treatment. Therefore, I felt inclined, when the judge issued this ruling and it became public, to make a comment that it was my feeling that treatment was not the primary focus of his sentence, which I was convinced of then and I remain convinced of today.[4]

We agree with the finding of the Commission as to Weaver's true motivation in talking to the press:

> As clearly reflected in his testimony, [Weaver] was concerned about how previous newspaper articles had characterized

---

[4]This testimony is an example of Weaver's self-serving characterization of the facts. When Weaver spoke with the reporter, he did not merely state his belief "that treatment was not the primary focus of [the judge's] sentence." Weaver impugned the judge's integrity by stating the judge was not honest.

> Judge Dillard's sentencing order. Quite simply, [Weaver] felt that he was the recipient of some bad press, and he went on a public relations offensive. In order to counter an article that questioned *his* honesty, [Weaver] questioned Judge Dillard's honesty.

Weaver acted on the basis of his anger when he said Judge Dillard was dishonest, not because there was any basis to believe that the judge had not stated the true reasons for Weaver's sentence. *See In re Pyle*, 156 P.3d 1231, 1247 (Kan. 2007) (holding attorney's criticism of members of disciplinary board was not protected by the First Amendment: "There is a line between just and unjust criticism. Respondent crossed it. This is evident from his plainly selfish motive. He displayed no desire to improve the disciplinary system, only to excuse its focus on him.").

We conclude Weaver did not have an objectively reasonable basis for his statement that Judge Dillard was not honest when he stated his reasons for sentencing Weaver to the Department of Corrections. Therefore, Weaver's conduct reflects a reckless disregard for the truth or falsity of his statement. Accordingly, this statement is not protected speech.

Our decision in this matter should not be construed as implying that a lawyer may be sanctioned merely for challenging or criticizing judicial acts. Judicial outcomes may be controversial and are often subject to robust public comment. Although it is well established that the speech of lawyers may be curtailed in order to avoid improper influence on pending cases, particularly when a jury is involved, or to otherwise prevent obstruction of justice, we recognize that the First Amendment generally protects lawyers who engage in fair commentary and expression of opinion regarding the state of the law. *In re Sawyer*, 360 U.S. 622, 627–28, 79 S. Ct. 1376, 1378–79, 3 L. Ed. 2d 1473, 1478–79 (1959) (Brennan, J., plurality opinion). Further, the mere assertion

by a dissenting judge or by academics that a court commits an honest error is not the basis for ethical sanctions. W. Bradley Wendel, *Free Speech for Lawyers*, 28 Hastings Const. L.Q. 305, 331–32 (2001).

In this case, however, Weaver did not simply disagree with Judge Dillard's reasoning or factual premises or argue that Judge Dillard's decision was inconsistent with precedent, improperly balanced the interests involved, or was contrary to history, tradition, and common sense. Moreover, unlike in *Yagman*, Weaver did not claim he was expressing an opinion that Judge Dillard was "intellectually dishonest," in the sense that Judge Dillard's sentencing decision might have been based upon an unstated premise or hidden bias. *See Yagman*, 55 F.3d at 1441. Instead, Weaver accused a judge of a specific act of dishonesty which he characterized at the hearing before the Commission as a "knowing concealment" of the judge's reasons for sentencing him. He was utterly unable to provide a reasonable basis for this charge at the hearing. Under these facts, we conclude that the First Amendment does not protect Weaver from being sanctioned for professional misconduct.

4. *Ethical violation.* Having determined Weaver falsely accused Judge Dillard of being dishonest in stating his reasons for the sentence imposed, we now consider whether this conduct violated the Iowa Code of Professional Responsibility for Lawyers. We conclude Weaver's conduct violated DR 1–102(A)(5), which prohibits an attorney from "engag[ing] in conduct that is prejudicial to the administration of justice."[5]

---

[5]Although the Board asserts Weaver violated additional disciplinary rules in stating Judge Dillard was not being honest, we do not discuss them, as they would be merely cumulative, would not change our decision with respect to an appropriate sanction, and would unnecessarily lengthen this opinion.

As we have observed in the past, "[f]alse accusations against judges harm the courts as institutions." *Comm. on Prof'l Ethics & Conduct v. Hurd,* 360 N.W.2d 96, 104 (Iowa 1984). By falsely accusing Judge Dillard of not being honest concerning his sentencing decision, Weaver implied there was some improper or sinister motivation underlying the judge's decision. *See Frerichs,* 238 N.W.2d at 767 (noting attorney's statements attributed to the court "sinister, deceitful and unlawful motives and purposes"). That Weaver's statement could be so interpreted is clearly illustrated by the reporter's headline: "Bias on the bench. Ongoing court battle pits judge against retired judge as Weaver makes allegations of personal bias, dishonesty against presiding judge." Clearly, Weaver's statement left the impression that courts do not do justice, but rather make decisions for undisclosed and improper reasons. When the public loses confidence in the integrity of the courts, the administration of justice is prejudiced. *See Notopoulos v. Statewide Grievance Comm.,* 890 A.2d 509, 521 (Conn. 2006) (holding attorney's disparaging statements regarding judge violated rule prohibiting conduct prejudicial to the administration of justice); *Pyle,* 156 P.3d at 1247 (stating the "administration of justice" rule seeks to protect the justice system in general from prejudice, not only a single trial or adjudicatory proceeding); *Graham,* 453 N.W.2d at 324 (holding statements impugning integrity of judge prejudiced the administration of justice). Thus, Weaver engaged in conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5).

**V.  Discipline**.

The principles guiding our decision as to the proper discipline are well established:

> The appropriate sanction in a particular case depends upon several factors that reflect the broad purpose of our disciplinary system. The disciplinary process is intended to protect not only the public, but also our system of justice. Therefore, we consider the nature and extent of the respondent's ethical violations not only to determine the respondent's fitness to practice law, but also to assess the need to deter other lawyers from similar misconduct. Only by ensuring that such conduct does not become commonplace or acceptable can we maintain the reputation of the bar and safeguard the integrity of our system of justice and the public's confidence in it. Because "sanctions must be tailored to the facts of each case," we also consider any mitigating and aggravating circumstances.

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bell*, 650 N.W.2d 648, 652 (Iowa 2002) (citations omitted) (quoting *Mulford*, 625 N.W.2d at 684). In light of these considerations, the Grievance Commission recommended a three-month suspension.

We agree with the Commission's assessment that Weaver's ethical infractions warrant a period of suspension. Weaver's misconduct brought shame upon attorneys, judges, and the court system in general. His violation of the criminal laws is sufficient standing alone to warrant a short suspension. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sloan*, 692 N.W.2d 831, 831 (Iowa 2005) (three-month suspension for two misdemeanor drug convictions); *Comm. on Prof'l Ethics & Conduct v. Shuminsky*, 359 N.W.2d 442, 443 (Iowa 1984) (three-month suspension for two misdemeanor drug convictions). His intemperate statements to the press further support the propriety of a suspension. Our system of justice cannot maintain the respect of its citizens if disappointed attorneys are permitted to make false and reckless accusations against judges. Such conduct must be discouraged. Moreover, Weaver's misconduct is aggravated by the fact he has considerable professional experience as an attorney and as a judge. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Vinyard,*

656 N.W.2d 127, 131 (Iowa 2003) (stating substantial experience is an aggravating circumstance).

Weaver contends there are mitigating circumstances that justify a less onerous sanction. He accurately notes he has no history of making disrespectful or false statements regarding other attorneys or judicial officers. Although he also points out that this proceeding presents his first ethical violation "as an attorney," that factor has little mitigating effect in view of the fact he has previously been reprimanded for a violation of the Code of Judicial Conduct. Weaver also relies on the lack of harm to any client. Even though his conduct did not harm a client, it brought the courts into disrepute, and therefore we do not consider the lack of harm to clients as an important mitigating factor.

Finally, Weaver argues any sanction should be mitigated by the fact he made the unethical statements as a litigant, not in his capacity as an advocate. He acknowledges the principle that the ethics rules apply to attorneys even when they are not acting in their professional capacity. *See Thompson*, 595 N.W.2d at 133–34. Nonetheless, he implies the adverse consequences of statements made by an attorney/litigant are minimal because "the readers of written comments understand the relationship between the court and the speaker." We are not persuaded readers of Weaver's statements simply chalked them up to an unhappy litigant. To the contrary, readers would be more likely to believe that Weaver, as an attorney and former judge, spoke with more knowledge and credibility than the average litigant unknowledgeable about the legal system. Consequently, we do not find Weaver's litigant status to be a mitigating circumstance under the facts of this case. *See Notopoulos*, 890 A.2d at 518 (holding disciplinary rules applied to attorney who disparaged judge handling case in which attorney was a pro se litigant:

disciplinary rules "apply to attorneys whether they are representing clients or acting as pro se litigants unless the language of the rule or its relevant commentary clearly suggests otherwise").

In summary, we do not think there are sufficiently mitigating circumstances to justify the issuance of a public reprimand in lieu of a suspension. We agree with the Commission's recommendation that Weaver's misconduct warrants a three-month suspension.

## VI. Disposition.

We suspend James Weaver's license to practice law indefinitely with no possibility of reinstatement for three months. This suspension shall apply to all aspects of the practice of law. *See* Iowa Ct. R. 35.12(3). Upon application for reinstatement, Weaver must establish that he has not practiced law during the period of his suspension and that he has in all other ways complied with Iowa Court Rule 35.21. Costs are taxed to Weaver. *See* Iowa Ct. R. 35.25(1).

## LICENSE SUSPENDED.

All justices concur except Wiggins, J., who takes no part.