# IN THE SUPREME COURT OF IOWA

No. 13–0372

Filed September 27, 2013

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**MARY ELLEN KENNEDY,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission recommends suspension of attorney's law license for ethical violations. **LICENSE SUSPENDED.**

Charles L. Harrington and David J. Grace, Des Moines, for complainant.

Roger L. Sutton, Sr. of Sutton Law Office, Charles City, for respondent.

**MANSFIELD, Justice**.

An Iowa attorney neglected several client matters, delayed proceedings, failed to communicate with her clients, failed to respond to disciplinary inquiries, and made groundless allegations that prosecutors had engaged in wrongdoing. Previously, this attorney had received a sixty-day suspension of her license primarily for neglecting client matters, as well as several public reprimands for various ethical violations. This attorney suffers from some health disorders, for which she is being treated, and does not presently practice law.

The Iowa Supreme Court Attorney Disciplinary Board brought charges against this attorney relating to six different clients. After a hearing, a division of the Grievance Commission of the Supreme Court of Iowa found numerous ethical violations and recommended the attorney's license to practice law be suspended indefinitely with no possibility of reinstatement for one year. Upon our de novo review, we concur in most of the findings of rule violations and agree that a one-year suspension is appropriate.

### I. Factual Background.

Mary Ellen Kennedy was admitted to practice law in Iowa in 1993. Before practicing law, Kennedy obtained degrees in secondary education and history and served as a high school and college teacher.

This case concerns Kennedy's handling of six client matters as a solo practitioner in Waterloo. The crux of the Board's complaint is neglect of client matters, although the Board also contends Kennedy took certain improper steps when she did act on her clients' behalf. We turn to those matters.

**A. Robinson Matter.** Stephanie Robinson retained Kennedy in 2008 to petition for dissolution of her marriage. She paid Kennedy a

$700 retainer. Robinson's then-husband, the respondent, lived in Benton County, but Kennedy mistakenly sent papers to the Linn County Sheriff, causing a delay in service.

The dissolution trial was set for October 18, 2010. Both parties appeared, Stephanie Robinson with Kennedy and Stephanie's husband Thomas without an attorney. Kennedy, however, was not prepared for trial, and the district court reset the trial date. The district court explained:

> Although Attorney Kennedy stated that the matter was ready for trial, it became apparent, after discussion with Attorney Kennedy and the Respondent that the parties were nowhere near prepared to proceed with trial as scheduled, even though this case has been on file since April 16, 2008.

The parties had not exchanged financial information or ascertained a number of facts needed to calculate child support payments.

Following the rescheduled trial, the district court ordered the marriage dissolved and determined custody, child support, and division of property. The court directed Kennedy to prepare a qualified domestic relations order (QDRO) "which will divide both of the accounts equally awarding [Stephanie Robinson] 50 percent of the balance." Kennedy never prepared the QDRO. Kennedy also acknowledges she neglected the matter, did not adequately communicate with her client, and was not ready for the initial trial date.

The Board asserts that Kennedy violated Iowa Rules of Professional Conduct 32:1.1, 32:1.3, 32:1.4, 32:3.2, and 32:8.4(d), in connection with this matter.

**B. Merrill Matter.** In 2009, Kennedy was hired to request reconsideration of Nathan Merrill's prison sentence. She received a $500 retainer from Merrill's stepfather. Kennedy did some work on the matter,

and kept the $500, but never filed a motion for reconsideration. Kennedy acknowledges she should have filed the motion, stating:

> Judge Fister said he wouldn't entertain any more reconsideration requests until [my client] took some classes, so I repeatedly wrote to him . . . [t]hat . . . he should take those classes because he had some kind of treatment that [his stepfather] would set up for him. However, I should have gone ahead and answered the reconsideration request, whether or not Judge Fister said he would entertain it or not. And I didn't do that.

Although Kennedy insists she earned the $500 through work performed on the case, she did not account to her client or his stepfather for her use of the retainer. In addition, she failed to make a copy of her file and trust account ledger available to the Board for its investigation. The Board summarized its position: "There was no accounting, which we've tried to get that. So the Board suspects that there's some kind of trust account violation here, but we have not dug into it as much as we could have."

The Board alleges that Kennedy violated rules 32:1.1, 32:1.3, 32:1.4, and 32:3.2, arising out of her failure to file the motion. In addition, it asserts she violated rule 32:1.15 and Iowa Court Rule 45.7 in connection with her failure to account for the retainer. Finally, because Kennedy failed to provide the Board with her client file and trust account ledger, the Board contends she violated rule 32:8.1(b).

**C. Manning Matter.** In May 2010, Kennedy was appointed to represent Anthony Manning in his pending postconviction relief proceeding, after the district court granted Manning's motion to have his previous attorney removed from the case. That July, the court issued a rule 1.944 notice that the matter would have to be tried by January 1, 2011, or else would be subject to dismissal. Kennedy never filed anything with the court. The matter was dismissed on January 3, 2011.

Kennedy did not notify Manning that his case had been dismissed. She explained:

> [I]n Mr. Manning's case, I visited Mr. Manning in Fort Madison three times. I worked very hard on his case. But the communication just wasn't there. I just couldn't—I could go visit him, but I couldn't write to him and explain what I was doing.

Manning complained to the Board about Kennedy's failure to act or communicate. In response, the Board requested that Kennedy provide copies of her correspondence with Manning. She received the Board's request, but did not respond to it.

The Board alleges that Kennedy's failure to act in Manning's case violated rules 32:1.1, 32:1.3, 32:1.4, and 32:3.2. In addition, the Board alleges that Kennedy's conduct was prejudicial to the administration of justice in violation of rule 32:8.4(d). Finally, the Board claims Kennedy violated rule 32:8.1(b) by failing to respond to its requests for information.

**D. Flores Matter.** Kennedy represented David Flores in a postconviction relief proceeding. In December 2009, the Polk County District Court granted relief in that proceeding, overturning Flores's first-degree murder and terrorism convictions and ordering a new trial. *See Flores v. State*, No. 10–0020, 2011 WL 1376777 (Iowa Ct. App. Apr. 13, 2011). While the State's appeal from that ruling was pending, in January 2010, Kennedy wrote a letter to the Iowa Attorney General, alleging misconduct on the part of the Polk County Attorney's office and to a lesser extent the attorney general's office. Kennedy's letter asserted that an inmate had been offered early release if he would testify against Flores, and when this inmate refused, he "was mistreated and isolated." The letter elaborated that the inmate "[wa]s being forced to take drugs

other than those necessary for his health and which render him unable to function effectively. He [wa]s being mentally, emotionally, and physically abused, according to the information [Kennedy] received." The letter alleged that the Polk County Attorney's office was behind the effort to coerce this inmate into testifying against Flores. It also accused the attorney general's office of directing the department of corrections to prevent Kennedy from visiting inmates, including her client.

A lengthy investigation by the Division of Criminal Investigation (DCI) determined that Kennedy's allegations were totally without merit. The inmate in question was taking prescription medication, and the prescription predated the Flores litigation. The inmate had not declined to meet with Kennedy; rather, he had asked only that his counsel be present. When the DCI spoke with Kennedy during its investigation, she was unable to provide any specifics in support of her charges. She "told [the investigator] she had sources, but she refused to tell [the investigator] who her sources were, citing attorney/client privilege."

At the hearing before the commission, Kennedy expressed regret for her course of conduct. She stipulated that her "statements and accusations were false[] and misguided by her misconception related to her mental instability." At the same time, in her hearing testimony, Kennedy stood by her assertion that she had "received information" regarding the substance of her letter. She explained:

> I received information that one of the possible witnesses was being I guess you would say drugged. In hindsight, I should have taken another route with that. I can't say too much. I feel I don't want to get into it because [Flores is] going to probably go to trial again.

The commission followed up, asking what Kennedy thought "might have been a more appropriate course of action." She replied:

> Possibly to file a Bar Complaint. What I wanted was an investigation. I didn't mean to accuse anybody and that's the way it came out. I wanted—I just wanted it looked into because, of course, I didn't have the capacity to do it. Possibly even checked with some people as to a better route that I could have taken. I was fairly exhausted and I just didn't use good judgment.

The Board maintains that Kennedy violated rules 32:4.1, 32:8.2(a), and 32:8.4(c) in connection with the Flores matter.

**E. Williams Matter.** In March 2011, Kennedy was appointed to represent James Williams on his application for postconviction relief. Kennedy never contacted Williams. Williams wrote to the court, explaining he had been unable to reach Kennedy, despite several attempts "via letters and phone calls seeking a response." Williams eventually filed a motion for withdrawal of counsel and appointment of substitute counsel, which stated that "to this day there has been no interaction of any type between counsel and Defendant, neither verbal nor written." The district court granted Williams's motion and appointed a new attorney to represent him in the matter.

The Board asserts that Kennedy violated rules 32:1.3, 32:1.4, and 32:8.4(d) in connection with Williams's postconviction relief matter.

**F. Stocks Matter.** In October 2007, Rusty Stocks retained Kennedy to bring a dental malpractice case. Stocks had incurred approximately $46,000 in medical expenses allegedly due to his dentist's professional negligence. Almost two years later, no petition had been filed against the dentist. On August 3, 2009, Kennedy's office sent Stocks a letter, stating:

> I have not heard from you in a while and our time is very short now to file the lawsuit. I have done some research and investigation on this matter and I think we can be successful in getting you a reimbursement for your injury. . . .

On August 28, 2009, Kennedy filed a petition against Stocks's dentist, alleging the dentist had failed to fully disclose certain risks of treatment, and had negligently diagnosed and treated Stocks. The dentist answered on October 1, 2009, denying liability, and simultaneously served a request for production of documents. On January 6, 2010, Kennedy filed a notice of identification of expert witness, giving the name, title, and address of her anticipated expert. The filing contained a certification that it had been served on all parties by mail.

Subsequently, the dentist's attorney complained he had received neither an expert certification nor responses to his discovery. Thus, on May 10, 2010, he wrote Kennedy asking if she would be willing to dismiss the matter "in light of [her] failure to provide discovery responses and provide an expert designation for a standard of care violation." Kennedy responded on May 14, stating that she was "very surprised by [the attorney's] letter of May 10" because she had not received any discovery requests—"no interrogatories, no request for documents— nothing." She asked that opposing counsel send her the discovery requests, which he did on May 17.

Opposing counsel served a second discovery request on Kennedy on June 8. The same day, opposing counsel informed Kennedy that he had just then received notice from the court of Kennedy's January expert certification. He stated that he had never received a copy from her, and in any event, the notice was insufficient under Iowa Code section 668.11 because it did not set forth the expert's qualifications or the purpose for calling the expert.

By July 12, opposing counsel sent Kennedy a letter stating all of her discovery responses were overdue and threatening to file a motion for

summary judgment within a week. On July 20, opposing counsel filed the motion, asserting the plaintiff, through Kennedy, had failed to provide information about his expert witness's qualifications and the purpose for calling the expert within 180 days of the defendant's answer. *See* Iowa Code § 668.11 (2009).

Kennedy served Stocks's answers to the defendant's interrogatories the next day. She did not furnish any further information about her proposed expert. She also filed a three-paragraph resistance to the defendant's motion on July 26. The filing did not address the missing information required by section 668.11.

The court set a summary judgment hearing for October 5, but then granted Kennedy's oral motion to continue and reset the hearing to November 16, 2010. In the meantime, opposing counsel again wrote Kennedy, on October 11, 2010, stating he had yet to receive requested documents or information about the plaintiff's expert witness. On October 26, the defendant filed a motion to compel discovery, which the court granted on November 9.

Before the November 16 summary judgment hearing, Stocks obtained new counsel and reached an agreement with the defendant to settle the case for $7500.

The Board alleges that Kennedy violated rules 32:1.1, 32:1.3, 32:1.4, 32:3.2, 32:3.4, 32:8.4(c), and 32:8.4(d) in connection with the Stocks matter.

## II. Procedural Background.

The Board filed its six-count complaint against Kennedy on September 13, 2012. On January 17, 2013, the Board and Kennedy submitted a stipulation to the commission. Therein, the parties agreed to certain facts and to the admission of certain exhibits. In addition,

Kennedy stipulated that all the Board's alleged ethical violations had occurred. Also, the parties stipulated that certain aggravating and mitigating factors were present. Finally, the parties waived formal hearing and joined in a recommended disposition. The parties' recommended sanction, which they acknowledged would not be binding on the commission or this court, was a suspension for six months with reinstatement conditioned on verification of Kennedy's fitness to practice law.

The commission received the stipulation but decided to hold a hearing so the parties would have an opportunity to submit additional evidence or make arguments. Because Kennedy had not filed a timely answer to the Board's original complaint, the commission deemed the complaint's allegations admitted.

At the February 11, 2013 hearing, a commission member asked the Board to address the client harm resulting from Kennedy's conduct. The Board maintained it could only prove financial harm as to one client, Rusty Stocks. Correspondence from Kennedy's office indicated Stocks had a good malpractice case involving over $40,000 in medical expense damages alone; instead, Stocks was forced to settle the case on the eve of the summary judgment hearing for only $7500.

In testimony at the hearing, Kennedy addressed what she believed to be the underlying cause of her ethical problems. Based on mental health counseling and physician consultations, Kennedy understands she has anxiety disorder, depression, and obsessive-compulsive disorder. She discussed how these ailments have affected her practice:

> I just became in some instances just frozen, immobile. I couldn't proceed with certain things. I just couldn't.
>
> . . . .

> I had to give up my office because of my income. . . . I tried to work out of my home, but I couldn't answer the phone even like when my son would call. I couldn't go to the post office, I couldn't go inside the post office. I couldn't write a letter or mail a letter. And things like that, it was just—for certain areas I just froze and I absolutely just couldn't do it. I had trouble leaving the house.
>
> . . . .
>
> I worked harder and harder and harder, because I kept thinking that if I worked—that it was something I was doing wrong, I wasn't working hard enough for the client, but yet the communication just wasn't there because I just simply couldn't do it.
>
> . . . .
>
> The State appealed in the David Flores case where I was successful at the District Court level, they appealed it, the State appealed it, and I appeared in front of the Court of Appeals en banc, with all of the judges, and I was nervous and everything, but it hardly bothered me. I mean, I was confident, I did it, but then at the same time I couldn't go to the post office and pick up my mail. I had to send somebody else.
>
> I wish it could explain it better why it happened, but it's just—it's just the way it was.

Kennedy introduced into evidence a letter jointly signed by a psychiatric social worker and the director of a mental health center, stating that Kennedy's mental health issues currently prevent her from practicing law.

Kennedy conceded she is not presently fit to practice law. She testified that she is now tutoring some college students, assisting an elderly man, and working for a "money store" lender. She agreed her license to practice law should not be reinstated until she can demonstrate that she is fit to practice. Kennedy also acknowledged she had not been carrying professional liability insurance in recent years.

Following the hearing, the commission issued its findings of fact, conclusions of law, and recommended sanction. It determined that

Kennedy had committed the violations to which she had stipulated. In lieu of the stipulated six-month suspension, the commission proposed a lengthier suspension of one year, with reinstatement conditioned on a mental health professional's certification of Kennedy's fitness to practice. As additional conditions of reinstatement, the commission recommended that Kennedy associate with an attorney in good standing who would supervise her cases and her trust account, and provide proof of professional malpractice insurance.

### III. Standard of Review.

We review attorney disciplinary proceedings de novo. Iowa Ct. R. 35.11(1); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Fields*, 790 N.W.2d 791, 793 (Iowa 2010). We give respectful consideration to the commission's findings and recommendations, but we are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 860, 864 (Iowa 2010). The burden is on the Board to prove attorney misconduct by a convincing preponderance of the evidence. *Id.* "This burden is less than proof beyond a reasonable doubt, but more than the preponderance standard required in the usual civil case." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 142 (Iowa 2004). It is also a less stringent burden than clear and convincing evidence which is "the highest civil law standard of proof." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515, 517 (Iowa 1996). If a violation is established, we "may impose a lesser or greater sanction than recommended by the commission." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Murphy*, 800 N.W.2d 37, 42 (Iowa 2011); *see also* Iowa Ct. R. 35.11(1).

The parties' stipulation of facts is binding. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCarthy*, 814 N.W.2d 596, 601 (Iowa 2012).

"However, a stipulation is not binding as to a violation or a sanction." *Id.* Those determinations are ours to make, based on our review of the parties' factual stipulation and the record. *Id.*; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCuskey*, 814 N.W.2d 250, 257 (Iowa 2012) ("Although McCuskey did not answer the Board's complaint and the facts alleged therein were therefore properly deemed admitted, we nonetheless conduct an independent review of alleged ethical violations.").

**IV. Review of Alleged Ethical Violations.**

The Board alleged, and the commission found, that Kennedy violated a number of our ethical rules. We now consider these alleged rule violations.

**A. Rule 32:1.1.** "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Iowa R. Prof'l Conduct 32:1.1.

> Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more extensive treatment than matters of lesser complexity and consequence.

*Id.* cmt. 5. Recently, however, we have treated neglect and incompetent representation as separate and distinct issues. We have said:

> To establish an attorney has violated rule 32:1.1, the board must prove the attorney did not possess the requisite legal knowledge and skill to handle the case or that the attorney did not make a competent analysis of the factual and legal elements of the matter.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Thomas*, 794 N.W.2d 290, 293 n.2 (Iowa 2011); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v.*

*Dunahoo*, 799 N.W.2d 524, 531 (Iowa 2011) (quoting this language from *Thomas*).

In both *Thomas* and *Dunahoo*, we held the Board failed to establish a competence violation because the record only established neglect of client matters and not *substantive* lack of competence on a factual or legal element. *See Dunahoo*, 799 N.W.2d at 531 ("The board has only shown instances of neglect, and we find the board has not shown by a convincing preponderance of evidence that Dunahoo lacked the skill or knowledge to handle the bankruptcy and foreclosure matters at issue in this proceeding."); *Thomas*, 794 N.W.2d at 293 n.2 ("Although the board demonstrated Thomas neglected the Cases' lawsuit by allowing a personal distraction to cause him to miss a crucial deadline, there is no evidence that Thomas lacked the necessary legal knowledge to handle the case or that he failed to properly analyze the substantive elements of the case.").

Accordingly, we do not find Kennedy violated rule 32:1.1 in connection with the Robinson, Manning, Merrill, or Williams matters. These are basically neglect situations like *Dunahoo* and *Thomas*. However, we do find Kennedy violated rule 32:1.1's competency requirement in the Stocks matter. By her own admission at the hearing, she was "in over [her] head" in the Stocks case. She brought a dental malpractice case even though (as she later stipulated) she had no expert, no ability of her client to pay for an expert, and no willingness to pay for an expert herself.

**B. Rule 32:1.3.** Rule 32:1.3 requires that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Iowa R. Prof'l Conduct 32:1.3; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Humphrey*, 812 N.W.2d 659, 664–65 (Iowa 2012) (finding an attorney

violated rule 32:1.3 when "the only action Humphrey took to represent his clients was to send two letters to the claim adjuster" and when the attorney failed to respond to repeated text messages and letters from his clients).

Under rule 32:1.3, "an ethical violation does not typically occur from one missed deadline, but arises when a lawyer 'repeatedly fail[s] to perform required functions as attorney . . . .'" *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 102 (Iowa 2012) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Grotewold*, 642 N.W.2d 288, 293 (Iowa 2002)). In several of these matters, Kennedy consistently failed to take necessary actions. She never filed Merrill's motion for reconsideration, never filed anything with the court in Manning's postconviction relief proceeding, and never even made contact with Williams. Her handling of the Stocks matter was characterized by untimely and incomplete discovery responses and other dilatory actions. In the Robinson dissolution matter, Kennedy had months to prepare, but appeared in court so unprepared that the court was forced to reset trial.

This constellation of conduct violated rule 32:1.3. *See Van Ginkel*, 809 N.W.2d at 100, 102 (finding a violation where an attorney, in a probate matter, allowed the estate to remain open almost five years, "well in excess of the three-year statutory limitation"); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 796 N.W.2d 910, 917 (Iowa 2011) (finding a violation where the attorney "went almost two years without speaking to [the client], and all attempts at communication after early 2008 were initiated by [the client]"); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 774 N.W.2d 301, 307 (Iowa 2009) (finding a rule 32:1.3 violation where the attorney failed to prepare a final decree in a

dissolution of marriage matter and failed to respond to several clients in different matters).

**C. Rule 32:1.4.** Rule 32:1.4 requires, among other things, that an attorney "keep the client reasonably informed about the status of the matter" and "promptly comply with reasonable requests for information." Iowa R. Prof'l Conduct 32:1.4(a)(3)–(4). Kennedy violated this rule as well.

In one instance, Kennedy *never* communicated with her client, Williams, despite his overtures. Kennedy also stipulated that she did not adequately communicate with Robinson. Additionally, she failed to tell Manning that his postconviction relief application had been dismissed due to her failure to file anything with the court. In that case, she admits "the communication just wasn't there." The record also indicates Kennedy did not adequately communicate with her clients in the Merrill and Stocks matters. This conduct falls significantly short of keeping clients "reasonably informed" and thus violates rule 32:1.4. *See Dolezal*, 796 N.W.2d at 917 (finding a rule 32:1.4 violation where attorney repeatedly failed to respond to client and client initiated all attempts at communication); *Thomas*, 794 N.W.2d at 292 (finding attorney violated rule 32:1.4 where he waited about five months after matter was dismissed to tell his clients "because he was embarrassed by his conduct").

**D. Rule 32:3.2.** Rule 32:3.2 requires Iowa attorneys to "make reasonable efforts to expedite litigation consistent with the interests of the client." Iowa R. Prof'l Conduct 32:3.2. Kennedy failed to show up prepared for a dissolution trial (Robinson), did not bring a motion for reconsideration she was hired to file (Merrill), did not file anything in two postconviction relief proceedings (Manning and Williams), and failed to

respond to discovery requests (Stocks). The Robinson trial had to be rescheduled; several matters had to be restarted with new counsel. This is the type of conduct we have held to violate rule 32:3.2. *See McCarthy*, 814 N.W.2d at 606 (concluding an attorney who failed to serve timely interrogatory answers violated rule 32:3.2); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cunningham*, 812 N.W.2d 541, 548 (Iowa 2012) ("Cunningham failed to appear at hearings and failed to participate in discovery in a timely manner. Failing to appear at hearings and participate in discovery does not constitute a reasonable effort to expedite litigation and therefore violates rule 32:3.2."); *Dolezal*, 796 N.W.2d at 914–15 (finding a rule 32:3.2 violation where an attorney failed to meet appellate deadlines, resulting in dismissal); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hoglan*, 781 N.W.2d 279, 283–84 (Iowa 2010) (finding a rule 32:3.2 violation where an attorney repeatedly failed to prosecute several appeals in different client matters). Accordingly, we conclude Kennedy violated rule 32:3.2.

**E. Rule 32:3.4.** Rule 32:3.4 governs fairness to opposing counsel and forbids lawyers from "fail[ing] to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party." Iowa R. Prof'l Conduct 32:3.4(d). Kennedy violated this rule.

In the Stocks matter, Kennedy now admits through the parties' factual stipulation that she "evaded the defendant's attorney's attempts to ascertain the identity and opinions of plaintiff's expert." This information had been sought by opposing counsel through an interrogatory as authorized by rule 1.508. Kennedy's persistent noncompliance fell short of being "reasonably diligent" and thus violated rule 32:3.4.

**F. Rule 32:8.2(a).** Rule 32:8.2(a) states, "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer, or public legal officer . . . ." Iowa R. Prof'l Conduct 32:8.2(a). The Board alleged, and the commission found, that Kennedy violated this rule by sending the accusatory letter to the attorney general in the Flores matter.

In *Iowa Supreme Court Attorney Disciplinary Board v. Weaver*, a case decided under the former Iowa Code of Professional Responsibility, we discussed at length the degree of scienter required when a lawyer is alleged to have committed an ethical violation by making a false accusation against a judicial officer. 750 N.W.2d 71, 80–82 (Iowa 2008). After extensive analysis, we concluded an objective recklessness test met constitutional standards and best served the interests of justice. *Id.* Thus, we rejected the notion that the attorney had to have had *subjective* doubts about the truth of what he was saying, as is required in the normal defamation context. *Id.*[1]

In concluding that false, objectively reckless statements could be the subject of discipline, we quoted at length from and relied heavily upon a Minnesota Supreme Court decision—*In re Disciplinary Action Against Graham*, 453 N.W.2d 313 (Minn. 1990). *See Weaver*, 750

---

[1][R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. . . . [T]he actual malice standard require[s] a high degree of awareness of . . . probable falsity.

*Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004) (citation and internal quotation marks omitted (discussing what is necessary to show actual malice in a defamation case)).

N.W.2d at 81. *Graham* involved Minnesota's counterpart to rule 32:8.2(a) and concerned an attorney who falsely accused judicial officers and a county attorney of "fixing" a case. *See Graham,* 453 N.W.2d at 317–19. The Minnesota Supreme Court determined that because different interests were protected by professional discipline and by the law of defamation, an attorney who made untrue statements concerning judicial and public legal officers could violate the ethical rules so long as the attorney had acted with objective recklessness, regardless of his or her subjective intent. *Id.* at 322; *see also Weaver,* 750 N.W.2d at 81.

Like the Minnesota Supreme Court in *Graham,* we see no reason to distinguish between judicial officers and public legal officers in applying rule 32:8.2(a). False criticism of both has the same potential to adversely affect the administration of justice and bring the legal system into unfair disrepute. Rule 32:8.2(a) addresses both sets of officials in tandem and does not suggest that the same operative language—i.e., "with reckless disregard as to its truth or falsity"—should have different meanings within the same rule.

In her January 27, 2010 letter to the attorney general, Kennedy accused the Polk County Attorney's office of "using pressure, including the use of drugs, to elicit some damaging testimony against Mr. Flores, by any means." She specifically charged that office with "breaking down" a particular witness, through mental and physical abuse, who had refused to testify against Flores. An exhaustive investigation found these contentions were without basis, and she has now stipulated they were false. Also, we find these statements relate to the "integrity" of a public officer. *See* Iowa R. Prof'l Conduct 32:8.2(a).

Utilizing the objective test set forth in *Weaver,* we also find Kennedy made these statements with a reckless disregard for their truth

or falsity. For one thing, at the commission hearing, Kennedy admitted she should not have written the letter and that she "didn't use good judgment." While she continued to claim she had some source of information for these accusations, as before, she refused to disclose what that source was. She also said, "What I wanted was an investigation. I didn't mean to accuse anybody and that's the way it came out." We conclude on our de novo review that Kennedy did not have "an objectively reasonable basis" for her false attacks on the integrity of public officers in the January 27, 2010 letter. *See Weaver*, 750 N.W.2d at 90. Accordingly, we find Kennedy violated rule 32:8.2(a).

**G. Rule 32:4.1(a).** Rule 32:4.1(a) states, "In the course of representing a client, a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person." Iowa R. Prof'l Conduct 32:4.1(a). The Board contends that Kennedy violated this rule in connection with the Flores matter. The term "knowingly" denotes "actual knowledge of the fact in question." Iowa R. Prof'l Conduct 32:1.0(f) (defining knowingly); *see also Van Ginkel*, 809 N.W.2d at 105. Thus, to establish a violation of this rule, the Board must prove by a convincing preponderance of the evidence that Kennedy actually knew her accusations were untrue.

On our de novo review, we are not persuaded Kennedy knew in January 2010 that what she was saying about the Polk County Attorney's office (and the attorney general's office) was false. Kennedy was suffering from mental health conditions, and it appears that this affected her judgment and perspective in significant ways. Both parties stipulated that Kennedy's statements and accusations in the Flores matter were "misguided by her misconception related to her mental instability." To the extent her statements were the result of

"misconception" related to "mental instability," this tends to undermine the proposition that she knowingly lied. We do not find a violation of rule 32:1.4(a).

**H. Rule 32:8.4(c).** "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c). The Board maintains Kennedy violated rule 32:8.4(c) in connection with her letter to the attorney general in the Flores matter and in her representation of Rusty Stocks. Because we have already found the misrepresentations in Kennedy's January 2010 letter violated rule 32:8.2(a), we will not address whether they also violated rule 32:8.4(c). *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 605 (Iowa 2011) ("When we find conduct violates a specific provision involving dishonesty, fraud, deceit, or misrepresentation, we will not find the same conduct violates rule 32:8.4(c)."); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hearity*, 812 N.W.2d 614, 621 (Iowa 2012); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 587 (Iowa 2011).

We turn, then, to Kennedy's conduct during her representation of Stocks. Here, we are not convinced that any misstatements by Kennedy to opposing counsel regarding whether she had received counsel's discovery requests rise above the level of negligence. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 182 (Iowa 2013) (stating that to establish a violation of rule 32:8.4(c), the Board must prove the lawyer acted with a " 'level of scienter that is greater than negligence' "(quoting *Netti*, 797 N.W.2d at 605)). Therefore, we do not find a violation of rule 32:8.4(c).

**I. Rule 32:1.15.** Rule 32:1.15 deals with the safekeeping of property:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of six years after termination of the representation.

. . . .

(c) A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.

. . . .

(f) All client trust accounts shall be governed by chapter 45 of the Iowa Court Rules.

Iowa R. Prof'l Conduct 32:1.15. Iowa Court Rule 45.7, which is incorporated into rule 32:1.15, governs advance fees paid to attorneys. That rule states in relevant part,

A lawyer accepting advance fee or expense payments must notify the client in writing of the time, amount, and purpose of any withdrawal of the fee or expense, together with a complete accounting. The attorney must transmit such notice no later than the date of the withdrawal.

Iowa Ct. R. 45.7(4).

In the course of representing Nathan Merrill, Kennedy accepted a $500 retainer from Merrill's stepfather. Kennedy states she took the $500 as compensation for work performed, and she notified Merrill she was doing this, while admitting she did not provide the accounting required by rule 45.7(4).

During the hearing before the commission, the Board noted that it suspected Kennedy engaged in some trust account violation in the Merrill matter, but that it could not be sure because Kennedy did not provide the Board with an accounting or correspondence with her client.

At the same time, the Board admitted "we have not dug into it as much as we could have." Without more evidence, we cannot find any violation beyond a failure to provide a complete accounting. *See Dunahoo*, 799 N.W.2d at 532–33 ("We find the record lacks sufficient detail to discern the amount or type of work Dunahoo performed before withdrawing fees from his trust account in these matters.").

**J. Rule 32:8.1(b).** Rule 32:8.1(b) makes it an ethical violation for an attorney in connection with a disciplinary matter to "knowingly fail to respond to a lawful demand for information from . . . [a] disciplinary authority." Iowa R. Prof'l Conduct 32:8.1(b). Kennedy admits she did not respond to the Board's requests for information in the Merrill and Manning matters. "If the respondent fails to respond, we may infer from the circumstances that the respondent knowingly failed to respond." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marks*, 814 N.W.2d 532, 540 (Iowa 2012) (finding that an attorney who failed to respond to the Board's complaint violated rule 32:8.1(b)). We determine Kennedy violated rule 32:8.1(b). *See McCarthy*, 814 N.W.2d at 610 (finding an attorney violated rule 32:8.1(b) by failing to respond to the Board's notices).

**K. Rule 32:8.4(d).** An attorney violates rule 32:8.4(d) when she or he "engage[s] in conduct that is prejudicial to the administration of justice." Iowa R. Prof'l Conduct 32:8.4(d).

> An attorney's conduct is prejudicial to the administration of justice when it violates the well-understood norms and conventions of the practice of law such that it hampers the efficient and proper operation of the courts or of ancillary systems upon which the courts rely.

*Rhinehart*, 827 N.W.2d at 180 (citation and internal quotation marks omitted). We have consistently found violations of this rule where an attorney's conduct "results in additional court proceedings or causes

court proceedings to be delayed or dismissed." *Id.*; *see Iowa Supreme Ct. Att'y Disciplinary Bd. v. Laing*, 832 N.W.2d 366, 373 (Iowa 2013) (finding a violation of rule 32:8.4(d) when attorneys' claiming of excessive fees resulted in additional legal proceedings); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marks*, 831 N.W.2d 194, 200 (Iowa 2013) (finding a rule 32:8.4(d) violation based on dilatoriness that placed additional burdens on the court). At the same time, we have cautioned against rule 32:8.4(d) being used as a drift net. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 768–69 (Iowa 2010) (holding the mere act of committing a crime does not violate rule 32:8.4(d) and emphasizing the rule is intended "to address violations of well-understood norms and conventions of practice only" (citation and internal quotation marks omitted)).

We conclude Kennedy engaged in conduct prejudicial to the administration of justice as alleged by the Board. Kennedy's actions (or more accurately inactions) led to protracted and otherwise unnecessary proceedings in the Robinson, Manning, Stocks, and Williams matters. Additionally, in a pending criminal case, Kennedy leveled reckless and untrue accusations against her client's prosecutors. As a result, law enforcement and prosecutorial resources were diverted in a needless investigation of Kennedy's charges. We thus believe Kennedy's conduct in the Flores matter hampered "the efficient and proper operation of . . . ancillary systems upon which the courts rely." *Id.* at 768 (citation and internal quotation marks omitted).

### V. Consideration of Sanction.

We now must determine what sanction is appropriate given Kennedy's violations of our rules of professional conduct. "We craft appropriate sanctions based upon each case's unique circumstances,

although prior cases are instructive." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kallsen*, 814 N.W.2d 233, 239 (Iowa 2012).

> We have repeatedly held that the goal of our ethical rules is to maintain public confidence in the legal profession as well as to provide a policing mechanism for poor lawyering. Important considerations include the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and our duty to uphold the integrity of the profession in the eyes of the public. In fashioning the appropriate sanction, we look to prior similar cases while remaining cognizant of their limited usefulness due to the variations in their facts. Often, the distinction between the punishment imposed depends upon the existence of multiple instances of neglect, past disciplinary problems, and other companion violations, including uncooperativeness in the disciplinary investigation. Aggravating and mitigating circumstances are also important.

*Humphrey*, 812 N.W.2d at 666 (citations and internal quotation marks omitted).

In this case, the Board and Kennedy stipulated to a nonbinding recommendation of a six-month suspension. The commission, however, concluded a somewhat longer suspension was warranted: "Based upon the number of stipulated violations, the nature of those violations, and the Respondent's disciplinary history, the Commission recommends an enhanced sanction of an indefinite suspension without the possibility of reinstatement for at least one (1) year. . . ." The commission further recommended that reinstatement be conditioned upon Kennedy's (1) providing certification from a mental health professional that she is physically and mentally able to resume the practice of law, (2) associating with a practicing attorney in good standing who certifies that he or she will act as a supervisor of Kennedy's cases and her trust account, and (3) providing proof of professional malpractice insurance. We give respectful consideration to the grievance commission's

recommendations concerning sanction but are free to impose a lesser or greater sanction. *Laing*, 832 N.W.2d at 373.

This case presents both mitigating and aggravating factors. Kennedy has been obtaining treatment since September 2011 for mental illness that presently renders her unfit to practice law. We have consistently said that "[p]ersonal illnesses, such as depression or attention deficit disorder, do not excuse a lawyer's misconduct but can be mitigating factors and influence our approach to discipline." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Curtis*, 749 N.W.2d 694, 703 (Iowa 2008). Kennedy is seeking treatment for her conditions. *See Marks*, 831 N.W.2d at 201–02 (emphasizing the importance of seeking treatment for the illness to be treated as a mitigating factor).

On the other hand, Kennedy has a significant history of prior discipline. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Powell*, 830 N.W.2d 355, 359 (Iowa 2013) (noting that in general "prior discipline is considered an aggravating factor"). In 2004, Kennedy received a sixty-day suspension for neglect of two matters, trust account violations in two matters, and a general failure to cooperate with the Board. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Kennedy*, 684 N.W.2d 256, 260–61 (Iowa 2004). We stated:

> Based primarily on the lack of any prior disciplinary action against Kennedy, we conclude a sixty-day suspension is warranted in this case. This discipline is consistent with our prior cases in the area and the relevant factors we consider and is supported by the particular circumstances involved in the case. In particular, Kennedy has taken steps to eliminate the problems underlying this case and we need not be overly concerned with her fitness to practice law following the period of suspension.

*Id.* at 261. Unfortunately, this was not the end of Kennedy's difficulties. In 2006, Kennedy was publicly reprimanded after failing to respond to

the Board's investigation of a probate delinquency. (The Board ultimately determined there had been no neglect, but had to establish the facts by obtaining the file itself directly from the court.) In 2008, Kennedy was publicly reprimanded for neglect, failure to provide competent representation, and a trust account violation in a child support modification proceeding. Also in 2008, Kennedy received a public reprimand when she disobeyed a court order forbidding her from contacting her former foster child without supervision by the department of human services. Additionally, in 2008, Kennedy was privately admonished for failing to respond to a Board investigation. Moreover, between 2010 and 2012, Kennedy has received five temporary suspensions for not responding to Board inquiries, one of which does not relate to a matter that is the subject of the present disciplinary proceeding.

In addition, Kennedy has twenty years' experience as an attorney, which can be considered an aggravating factor. *McCuskey*, 814 N.W.2d at 258 ("McCuskey's substantial legal experience is another aggravating factor.").

Typically, our cases involving attorney neglect result in sanctions ranging from a public reprimand to a six-month suspension. *Humphrey*, 812 N.W.2d at 666.

> In cases involving multiple instances of neglect, other additional violations, or a history of past disciplinary problems, however, the sanction has typically involved a suspension for some length of time. In cases involving neglect in one or two cases and other misconduct such as misrepresentations associated with the neglect, the suspensions have been in the range of three months. In other cases where the pattern of misconduct has been more extensive, suspensions have typically been for a longer period of time.

*Van Ginkel*, 809 N.W.2d at 109 (citation omitted). "We consider any harm to the client caused by the neglect in determining the proper sanction. Additionally, neglect compounded by misrepresentation will warrant a more severe sanction because of the critical importance of honesty in our profession." *Thomas*, 794 N.W.2d at 294 (internal citation omitted).

We have imposed suspensions greater than six months when there have been additional, significant violations besides neglect. In *McCarthy,* we suspended an attorney for two years for neglecting the matters of multiple clients, making a series of misrepresentations to clients about the status of their cases, failing to appear in court, failing to return unearned fees, and failing to comply with court orders. *McCarthy*, 814 N.W.2d at 610–11. Unlike here, the Board in *McCarthy* established serious trust account violations. The attorney failed to notify his clients about withdrawals, commingled client funds with his own, and failed to return unearned fees. *Id.* at 610. Also, there had been multiple instances of misrepresentation, a failure to make appearances, and the filing of a court document that McCarthy knew contained a forged signature. *Id.* at 609. Like Kennedy, McCarthy had a checkered disciplinary history; he had been temporarily suspended four times and once suspended for six months, admonished four times, and publicly reprimanded four times; much of this arose from neglect of client matters. *Id.* at 611.

In *Iowa Supreme Court Attorney Disciplinary Board v. Johnson*, we suspended for three years the license of an attorney who among other things failed to file a bankruptcy petition for a client, failed to respond to clients' telephone calls and requests for information, and failed to provide notice to client of termination of the attorney–client relationship. 792

N.W.2d 674, 681, 684 (Iowa 2010). Johnson, like Kennedy, severely neglected four client matters. *Id.* at 684. Both attorneys failed to respond to clients' phone calls and requests for information on numerous occasions. But *Johnson* involved additional circumstances not present here: failure to appear for status conferences, misrepresentation to clients, general disregard for court orders, and presentation of an ex parte order to a court under false pretenses. *Id.* at 680. In addition, Johnson had a "pattern of charging clients excessive fees . . . and failing to return unearned portions of fees." *Id.* at 682. Johnson presented no mitigating factors. *Id.*

Thus, "[w]here neglect is compounded by other serious offenses, . . . this court has suspended the license of the offending attorney for substantial periods of time. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Joy*, 728 N.W.2d 806, 815–16 (Iowa 2007) (gathering cases involving one- to three-year suspensions for neglect plus other serious violations). In *Joy*, we suspended for eighteen months the license of an attorney who neglected four separate matters with a "persistent pattern of delinquencies, missed deadlines, and evasive and misleading statements." *Id.* at 812. The attorney had engaged in a pattern of misrepresentations to conceal his neglect of files, failed to turn over client papers, and failed to respond to the Board's inquiries. *Id.* at 814– 15.

Attorneys who demonstrate a pattern of neglect, but without other serious violations, have received less severe sanctions. In *Iowa Supreme Court Attorney Disciplinary Board v. Walker*, we imposed a six-month suspension on an attorney who had neglected multiple clients' matters. 712 N.W.2d 683, 686 (Iowa 2006). Walker failed to communicate with clients and neglected three estate matters, one of which resulted in a

penalty to his client. *Id.* at 684. Walker engaged in some degree of misrepresentation to cover up his neglect. *Id.* at 684–85. We included Walker's depression as a factor which "may influence our approach to discipline." *Id.* at 686.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Stein*, we suspended an attorney's license for 180 days after he neglected two of his clients' cases. 586 N.W.2d 523, 526 (Iowa 1998). The neglect in *Stein* "[wa]s compounded by the false explanations and certifications made by Stein to opposing counsel, the district court and our court, all in a clear attempt to conceal his neglect of his clients' cases." *Id.* It appears Stein, unlike Kennedy, made a habit of covering his neglect with misrepresentations; however, Stein had no prior disciplinary record and his neglect touched fewer matters. *Id.*

In *Iowa Supreme Court Attorney Disciplinary Board v. Schumacher*, we considered the proper sanction for an attorney who severely neglected three client cases. 723 N.W.2d 802, 803–04 (Iowa 2006). That case, like this one, involved an attorney who failed to respond to multiple clients, was not diligent in pursuing essential tasks, and also failed to respond to inquiries by the Board. *Id.* The neglect was "pervasive." *Id.* at 805. We imposed a six-month suspension. *Id.*

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Sullins*, we suspended for one year the license of an attorney whose overall conduct mirrored Kennedy's—constant and prolonged refusal to update clients or act on their behalf. 613 N.W.2d 656, 657 (Iowa 2000). We characterized Sullins's conduct as follows:

> Although other highly disturbing misconduct is hinted, the central theme in this exasperating case is "stonewalling," a stubborn refusal to address a clear duty. Ray Sullins, the respondent attorney, seems to have raised procrastination to

> a high art. He plays no favorites. He has consistently spurned the inquiries of our board of ethics and conduct in exactly the same manner demonstrated with his clients.

*Id.* at 656. Sullins, across several client matters, failed to timely respond to the Board, failed to answer interrogatories, failed to give his client an accounting, and could not provide (or did not keep) a case file. *Id.* at 657. He also had a substantial record of prior discipline, did not comply with an oral agreement to settle a fee dispute, and failed to return client papers and unearned fees. *Id.*

In *Iowa Supreme Court Attorney Disciplinary Board v. Hauser,* we suspended an attorney for six months, when the primary violation was severe neglect. 782 N.W.2d 147, 153–54 (Iowa 2010). Hauser abandoned his client without any notification. *Id.* at 153. Like Kennedy, he failed to timely respond to the Board's inquiries. *Id.* at 154. Like Kennedy, he failed to provide an accounting for withdrawn fees and never returned any of his client's retainer. *Id.* at 152. Hauser acknowledged that illness, alcoholism in his case, played a significant part in his misconduct. *Id.* Hauser had a history of three public reprimands for neglect of client matters, failure to respond to the board's inquiries, and failure to return a retainer, as well as five suspensions for failing to comply with continuing legal education requirements. *Id.* at 150.

Upon our review, we agree with the commission's recommendation that Kennedy should receive an indefinite suspension of her license with no possibility of reinstatement for one year. This case involves multiple instances of neglect. Kennedy's inactions caused financial harm to one client and resulted in other matters being dismissed or delayed. Furthermore, in one matter, Flores, Kennedy committed a different species of misconduct by recklessly leveling groundless charges against public officers. And Kennedy had already amassed a substantial

disciplinary record, including a sixty-day suspension primarily for neglect. The confidence we placed in her in 2004, when we said that "Kennedy has taken steps to eliminate the problems underlying this case and we need not be overly concerned with her fitness to practice law following the period of suspension," was clearly misplaced. *See Kennedy*, 684 N.W.2d at 261. We are sympathetic to Kennedy's recognition of and her efforts to obtain treatment for her health disorders. To some extent this mitigates the effect of the prior disciplinary record. Still, we believe a one-year suspension is necessary to achieve the goals of the disciplinary system and be consistent with our prior cases.

We also agree with the commission that prior to any reinstatement, Kennedy must provide an evaluation from a licensed mental health professional verifying her fitness to practice law. *See Marks*, 831 N.W.2d at 203 (imposing a similar condition); *Cunningham*, 812 N.W.2d at 553 (same); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Axt*, 791 N.W.2d 98, 103 (Iowa 2010) (conditioning reinstatement on treatment for depression and chemical dependency). However, we decline to require that Kennedy be supervised by a practicing attorney in good standing as a condition of reinstatement. *See Johnson*, 792 N.W.2d at 683 (declining to impose this condition and noting the absence of effective machinery for such supervision). Likewise, we decline to require proof of malpractice insurance, a condition that could seemingly be imposed in many attorney disciplinary cases, but which we have not utilized since 2004. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Honken*, 688 N.W.2d 812, 822 (Iowa 2004).

**VI. Disposition.**

For the foregoing reasons, we suspend Kennedy's license to practice law in this state for an indefinite period without the possibility of

reinstatement for at least one year. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 35.13(3). Kennedy must comply with Iowa Court Rule 35.23 regarding the notification of clients and counsel.

Upon any application for reinstatement, Kennedy must establish that she has not practiced law during the suspension period and that she has in all ways complied with the requirements of Iowa Court Rule 35.14. Prior to any application for reinstatement, Kennedy must provide the Board with an evaluation by a licensed mental health professional verifying her fitness to practice law. The costs of this action are taxed to Kennedy pursuant to Iowa Court Rule 35.27.

**LICENSE SUSPENDED.**